On an application to probate a will, it appeared that testator and his wife had parted, and that he brought suit for divorce,—whether for the purpose of making the wife return to him, or in earnest, being in doubt; that after the separation he went to live with his sister and nieces, and while there made a will leaving his property to one of his nieces, and that at the same time he gave her property worth $3,000; that these relatives remonstrated with him for drinking too much, but that there was no open breach between them; that shortly before his death he visited the office of an attorney, and executed a will revoking all former wills, and giving all of his property to his wife; that this will was never found, but was proved by the attorney who drew it to have been duly executed, and his testimony was corroborated by a witness who loaned the testator money to pay for the will, and a witness who directed him to the attorney, and by the other subscribing witness. *Held* sufficient to establish a revocation of the first will by the later one.

Application for probate of the last will of Russell Myers, deceased. Probate refused.

Joseph K. Murray, for proponent.
McKoon & Luckey, for contestant.

VARNUM, S. This matter was pending before Mr. Surrogate ARNOLD, and has since been submitted to me. The facts in the case are unusual, and the testimony somewhat contradictory, but the history of decedent's testamentary acts seems to be as follows: For some 6 years prior to April, 1895, the decedent and the contestant, his second wife, had been living together. He was a man upward of 70 years of age, and much addicted to drink; and the contestant's witnesses swear that it was on this account that she left decedent, while, on the other hand, it is in evidence that decedent brought a suit for divorce against contestant after the separation, although there is much conflict as to the avowed purpose of this act,—some witnesses swearing that he told them this was a ruse to make her return to him, while his lawyers testify that he was in haste to have the action proceed, and they believe he was thoroughly in earnest. It is undisputed, however, that at the time mentioned his wife left him, and he went to live with his sister and nieces, who had not been at all intimate with him theretofore. About this time—to wit, on April 30, 1895—he made the will sought to be probated, leaving all his property to one of his nieces with whom he was living, and at about the same time he gave her certain property of the value of $3,000. The attorney for the proponent, who also represented the decedent in his divorce suit, drew this will and supervised its execution; and it would seem that it was duly executed, and that the decedent had requisite testamentary capacity. After its execution he continued to live with his sister and her family through the summer of 1895, except when he went on fishing trips. During this time he drank heavily, even more so than had been his custom theretofore; but, while there is some evidence that his habits caused his relatives to remonstrate with him, there was no breach with them, and no apparent reason why he should change his testamentary intention as expressed in the will made in April, if he really were sincere in instituting his action for divorce. Nevertheless, on or about the 24th or 25th day of September, 1895, a man giving the name of, and, I think, satisfactorily identified as being, the decedent, went to the office of an attorney in this city, other than the one who had drawn the will referred to, and executed another will, revoking all prior ones, and leaving all his property to his wife, the contestant. This will was not found after the decedent's death, which occurred a few days after it was made; but its execution was discovered through an advertisement published in the newspapers after evidence had been adduced in this proceeding to the effect that decedent had said that he contemplated making another will, and had borrowed $20 to pay for it. The making of the second will is proved by the evidence of the attorney who drew it, who produces a draft thereof, and was a subscribing witness, and by the other subscribing witness, who testifies, not only to the due execution, but as to the contents; and, while my opinion of the credibility of the latter has not been improved by his conduct when questioned about the criminal proceedings in which

he had been concerned, yet I think the execution of said will suf-ficiently established. That being so, there is nothing in the evidence to indicate any unsoundness in testator's mind at the time of making it; and, aside from the evidence of the subscribing witnesses on this point, there is always the presumption of sanity. I might add that certain corroborative evidence, such as that of the attorney in the office where the second will was drawn, who saw decedent come in to see his associate, of the cigar maker who answered decedent's in-quiry as to the attorney's address, and of the witness who lent dece-dent the $20 to pay for his will, ought not to be disregarded. The evidence introduced to prove an alibi I do not regard as sufficiently strong for that purpose, in the face of the other evidence referred to above. It follows, therefore, that probate to the instrument pro-pounded by the petitioner must be denied, since, even if the second will were revoked, the first would not, in the absence of special cir-cumstances, not here present, be revived. 2 Rev. St. pt. 2, c. 6, tit. 1, art. 3, § 53. The question whether the will made in September, 1895, can be proved as a lost will, or whether the decedent died in-testate, is not before the court.

Decreed accordingly.